J-A07023-15

2015 PA Super 195

| EUGENE R. YENCHI AND RUTH I. YENCHI, HUSBAND AND WIFE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellants | |
| v. | |
| AMERIPRISE FINANCIAL, INC., AMERIPRISE FINANCIAL SERVICES, INC., RIVERSOURCE LIFE INSURANCE COMPANY AND BRYAN GREGORY HOLLAND | |
| Appellees | No. 753 WDA 2014 |

Appeal from the Judgment Entered May 5, 2014
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD 01-006610

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUNDY, J.

OPINION BY BENDER, P.J.E.:                    **FILED SEPTEMBER 15, 2015**

Eugene R. Yenchi and Ruth I. Yenchi (the Yenchis or Appellants) appeal from the judgment entered May 5, 2014, following a trial that resulted in a favorable verdict for Appellees, Ameriprise Financial, Inc., Ameriprise Financial Services, Inc., Riversource Life Insurance Company, and Bryan Gregory Holland.  Essentially, the Yenchis challenge allegedly improper sales practices by Appellees, which induced them to purchase life insurance.  In our view, where the offer to sell an insurance product is premised upon the results of an allegedly independent financial analysis, a

question of fact may arise regarding whether the financial analyst/insurance salesperson incurs a fiduciary duty.

This conclusion requires a rather complicated disposition. Initially, we reverse in part the summary judgment entered by the trial court in favor of Appellees. The trial court's decision on summary judgment formed the basis of evidentiary decisions affecting the Yenchis' remaining claims. Accordingly, we vacate the judgment entered and remand for a new trial on those claims. For clarity on remand, we affirm two of the trial court's rulings. Thus, we affirm in part, reverse in part, vacate the judgment entered and remand.

In 1995, Mr. Holland contacted the Yenchis, identified himself as a financial advisor from American Express, and offered to perform a financial analysis on their behalf. The Yenchis met with Mr. Holland at his office in December 1995, and agreed to purchase a financial analysis for $350.00. The Yenchis discussed their current financial status with Mr. Holland, providing him information regarding their employment, savings and insurance coverage. Thereafter, Mr. Holland presented the Yenchis with a detailed, financial management proposal, including several recommendations to better prepare for their retirement.

One recommendation from the proposal entailed consolidation of the Yenchis' several life insurance policies into a single, universal life insurance

policy from IDS Life Insurance (IDS).[1]  Mr. Holland represented to the Yenchis that they could use the cash value of their pre-existing policies to finance a new, single policy, and that the premiums required would never increase and would cease after eleven years.  In June 1996, the Yenchis followed this recommendation; cash-surrendered several policies; and used the proceeds to help finance the purchase of a new policy in Mr. Yenchi's name.  The policy provided an initial death benefit of $100,000.00, decreasing at regular intervals, and included a $25,000.00 rider for 20 years for Mrs. Yenchi.  The premium for the policy was to be $240.00 per month.

Mr. Holland also recommended that the Yenchis purchase a deferred, variable annuity from IDS to prepare for Mrs. Yenchi's retirement.  According to Mr. Holland, the annuity would mature when Mrs. Yenchi reached age sixty-five, at which point, she would receive a monthly check.  In March 1997, the Yenchis followed this recommendation.  In order to finance the purchase of the annuity, the Yenchis cash-surrendered their remaining life insurance policies and further agreed to deposit $75.00 per month into the annuity fund.

In 2000, the Yenchis had the life insurance policy reviewed independently.  Following this review, they learned that the policy was underfunded, that their premiums would never cease, and that, in fact, their

---

[1] During the course of this litigation, IDS became known as RiverSource Life Insurance Company.

premiums would increase. At some point, the Yenchis also learned that the annuity purchased in 1997 would not mature until 2025, when Mrs. Yenchi will be eighty-four years old (not sixty-five). Moreover, the Yenchis learned that any early withdrawals from the annuity fund would incur penalty charges.

The Yenchis commenced this lawsuit in April 2001.[2] Thereafter, they filed a complaint in November 2003, alleging negligent misrepresentation, fraudulent misrepresentation, violation of the Unfair Trade Practices Consumer Protection Law (UTPCPL),[3] bad faith, breach of fiduciary duty, and negligent supervision.

In June 2011, Appellees filed a motion for summary judgment, *inter alia*, contending that the Yenchis could not establish a fiduciary relationship as a matter of law. Appellees' Motion for Summary Judgment, 06/03/2011, at 4; **see also** Appellees' Memorandum of Law in Support of Motion for Summary Judgment, 06/03/2011, at 24-28. The trial court agreed and

---

[2] The Yenchis opted out of two, class action lawsuits filed against American Express Financial Advisors. **See Benacquisto v. Am. Express Fin. Corp., et al.**, No. CIV. 00-1980 (D. Minn.); **In re: Am. Express Fin. Advisors Sec. Litig.**, No. 1:04-CV-01773 (S.D.N.Y.).

[3] 73 P.S. §§ 201-1 – 201-9.3.

dismissed the claim for breach of fiduciary duty. *See* Trial Court Order, 03/25/2013.[4]

Prior to trial, the Yenchis voluntarily dismissed their claim for negligent misrepresentation. Trial commenced in January 2014. Thereafter, a jury returned a verdict in favor of Appellees on the claim of fraudulent misrepresentation, whereas the trial court found in favor of Appellees on the UTPCPL claim. The Yenchis timely filed post-trial motions for relief that were denied by the trial court, *see* Trial Court Order, 04/14/2014; timely appealed from the judgment entered; and filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued responsive memoranda.

The Yenchis raise the following issues on appeal:

[1.] [Whether] the trial court err[ed] in partially granting [Appellees'] motion for summary judgment by dismissing [Appellants'] fiduciary duty claim[;]

[2.] [Whether] the trial court err[ed] by entering an order denying [Appellants'] "global" motion to compel discovery concerning production of documents responsive to [Appellants'] request regarding management's knowledge and awareness of planning, design[,] and use of financial planning services as a tool for deceptive life insurance sales, and the knowledge of sales problems with universal life insurance policies[;]

[3] [Whether] the trial court err[ed] by granting [Appellees'] motions in limine based on the dismissal of [Appellants'] fiduciary duty claim and thereby limiting the introduction of evidence of fraudulent misrepresentation at trial[;]

_____

[4] Without analysis accompanying its March 2013 decision, the trial court granted Appellees' motion in part, dismissing all counts as to the annuity, as well as counts IV, V, and VI as to the life insurance. *See id*.

[4] [Whether] it was reversible error for the trial court[] to decide the UTPCPL claim using the pre-amended 1996 version of the statute[; and]

[5] [Whether] the trial court err[ed] by entering an order striking all of [Appellants'] voir dire questions without amending the questions.

Appellants' Brief at 5 (internal capitalization modified).

In their first issue, the Yenchis contend that the trial court erred when it dismissed their claim for breach of fiduciary duty on Appellees' motion for summary judgment.

> Our scope of review of an order granting summary judgment is plenary. We apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.
>
> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of his cause of action. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a prima facie cause of action or defense and, therefore, there is no issue to be submitted to the fact-finder. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate court may disturb the trial court's order only upon an error of law or an abuse of discretion.

**_DeArmitt v. N.Y. Life Ins. Co._**, 73 A.3d 578, 585-586 (Pa. Super. 2013) (internal citations and quotation marks omitted; some punctuation modified).

- 6 -

Further background on Appellees' motion will be helpful. Their precise contention before the trial court was that "[t]here was no fiduciary relationship as a matter of law." Appellees' Motion for Summary Judgment, 06/03/2011, at 4. In support of this contention, Appellees first characterized their relationship with the Yenchis merely as one between the seller and purchaser of insurance. **See** Appellees' Memorandum of Law in Support of Motion for Summary Judgment, 06/03/2011, at 24. As such, Appellees thereafter argued that no confidential relationship could arise, absent evidence that the Yenchis ceded decision-making authority to Mr. Holland. **Id.** at 24-25 (citing in support **Ihnat v. Pover**, 1999 WL 34788321 (Pa. Com. Pl. Feb. 1, 1999) (Wettick, J.)).

In response, the Yenchis identified evidence supporting their basic contentions that Appellees presented themselves as financial experts, who conducted a financial analysis on their behalf (in exchange for payment) that resulted in a financial management proposal. **See, e.g.**, Appellants' Response to Motion for Summary Judgment (Response), 02/06/2013, at 3-4. The Yenchis conceded that elements of this proposal included both the purchase of new life insurance, **see id.** at 4-7, and the purchase of the annuity, **see id.** at 7-9. However, according to the Yenchis, because they paid Mr. Holland to provide investment-planning advice, their relationship

was not merely a typical relationship between insurer and insured, and a confidential relationship arose.[5] *Id.* at 20.

The trial court rejected the Yenchis' argument. Relying on its previous rulings, the court concluded that "the relationship between the seller of insurance and the purchaser of insurance should not be characterized as a fiduciary relationship," absent those "instances in which the policyholder authorized the agent to make decisions on behalf of the policyholder." Trial Court 1925(a) Memorandum (Wettick, J.), 07/25/2014, at 2 (citing in support its prior decisions in *Ihnat v. Pover*). The court rejected any material difference in the factual basis offered by the Yenchis, specifically discounting a potential distinction based on Appellees' alleged role as financial advisors. *Id.* at 2-3.

With this background in mind, we turn to the law that informs our decision. Typically, the purchase of insurance is considered an arm's-length transaction, in which the insurer incurs no fiduciary duty apart from those

_____

[5] As noted by Appellees, at the summary judgment stage of this case, the Yenchis relied solely upon Appellees' alleged role as financial experts to establish a question of fact regarding whether a confidential relationship arose between themselves and Mr. Holland. Despite the plenary scope of our review, we may not consider additional evidence suggested by the Yenchis on appeal, some of which was not introduced until trial. *See, e.g.*, Appellants' Brief at 19 (citing trial testimony and exhibits); *see also* Pa.R.C.P. 1035.3 (providing that an adverse party may not rest on the pleadings, but must identify "issues of fact arising from evidence in the record" or "evidence in the record establishing facts essential to the cause of action"). Nevertheless, this observation shall not be understood to preclude the introduction of this evidence upon remand.

that may be defined in the contract for insurance. *See, e.g.*, *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 235-236 (3d Cir. 2005) (recognizing Pennsylvania policy that parties act at arm's-length when negotiating insurance contracts)); *see also Wisniski v. Brown & Brown Ins. Co.*, 906 A.2d 571, 578-79 (Pa. Super. 2006) (presuming that "for the great majority of [insurance] broker-client interactions, the relationship will not be so extremely one-sided as to be confidential").

However, we are aware of no binding precedent that would preclude the recognition of a confidential relationship merely because the parties conduct an insurance transaction. Previously, where this Court has declined to recognize a confidential relationship in the context of an arm's-length, commercial contract, we have stopped short of prohibiting such recognition in all cases. *See, e.g.*, *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 22-23 (Pa. Super. 2002) (properly limiting recognition of a confidential relationship to those cases in which "the relationship goes *beyond* mere reliance on superior skill") (emphasis in original). Indeed, this Court has previously recognized that "[o]f course, it is possible for a[n] [insurance] broker to enter into a confidential relationship with a client." *Wisniski*, 906 A.2d at 578 n.3; *see also Paone v. Dean Witter Reynolds, Inc.*, 789 A.2d 221, 226 (Pa. Super. 2001) (relying upon the trial court's finding that a confidential relationship arose between an investor and his broker), *appeal denied*, 808 A.2d 572 (Pa. 2002).

This is sensible. Apart from a few relationships deemed confidential as a matter of law, it has long been the standard in Pennsylvania that whether a confidential relationship has arisen poses a question of fact:

"The general test for determining the existence of [a confidential] relationship is whether it is clear that the parties did not deal on equal terms." *Frowen v. Blank*, 425 A.2d 412, 416 (Pa. 1981). A confidential relationship was defined in *Brooks v. Conston*, 51 A.2d 684 (Pa. 1947), as follows:

Confidential relation is any relation existing between parties to a transaction wherein one of the parties is bound to act with the utmost good faith for the benefit of the other party and can take no advantage to himself from his acts relating to the interest of the other party[.] *Leedom v. Palmer*, 117 A. 410 (Pa. 1922); *Harrison v. Welsh*, 145 A. 507 (Pa. 1929); [*In re*] *Null's Estate*, 153 A. 137 (Pa. 1930). This Court has recently defined confidential relationship in *Drob v. Jaffe*, 41 A.2d 407 (Pa. 1945). Mr. Justice Horace Stern said, [] "... a confidential relationship is not limited to any particular association of parties but exists wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest[.]" That case was cited with approval in *Hamberg v. Barsky et al.*, 50 A.2d 345 (Pa. 1947), and in *Shook v. Bergstrasser*, 51 A.2d 681 (Pa. 1947). *See also: McCown v. Fraser*, 192 A. 674 (Pa. 1937); *Metzger v. Metzger*, 14 A.2d 285 (Pa. 1940); [*In re Stewart's Estate*], 47 A.2d 204 (Pa. 1946); [*In re Dichter's Estate*], 47 A.2d 691 (Pa. 1946).

*Id.* at 688. A confidential relationship "is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed[.]" *Leedom*, 117 A. at 411. In some cases, as between trustee and *cestui que* trust, guardian and ward, attorney and client, and principal and agent, the existence of a confidential relationship is a matter

of law. In others, as between parent and child or brother and sister, the existence of a confidential relationship is an issue of fact to be established by the evidence. ***Null's Estate***, 153 A. at 139. ***Accord: Peoples First Nat'l Bank & Trust Co. v. Ratajski***, 160 A.2d 451 (Pa. 1960). Although the mere existence of kinship does not, of itself, give rise to a confidential relation, it is a factor to be considered. ***See: Moyer v. Moyer***, 51 A.2d 708, 709 (Pa. 1947); ***Null's Estate***, *supra*. ***See generally: Peoples First National Bank and Trust Co. v. Ratajski***, *supra* (uncle and niece); ***Hamberg v. Barksy***, 50 A.2d 345 (Pa. 1947); ***Drob v. Jaffe***, 41 A.2d 407 (Pa. 1945).

***In re Estate of Mihm***, 497 A.2d 612, 615 (Pa. Super. 1985) (internal citations reformatted; some punctuation modified; footnote omitted); ***see also Biddle v. Johnsonbaugh***, 664 A.2d 159, 162 (Pa. Super. 1995) ("[T]he existence of a confidential relationship is a question of fact to be established by the evidence."). Thus, the existence of a confidential relationship requires a fact-sensitive inquiry not to be disposed rigidly as a matter of law. ***See Basile v. H & R Block, Inc.***, 777 A.2d 95, 101 (Pa. Super. 2001) ("The concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line.") (quoting ***In re Estate of Scott***, 316 A.2d 883, 885 (Pa. 1974)).

According to the trial court, a confidential relationship may not arise in the context of an insurance transaction absent evidence that the insured has ceded decision-making authority to the insurer. ***See*** Trial Court 1925(a) Memorandum (Wettick, J.), 07/25/2014, at 2. In our view, the court's exclusionary rule is flawed in two respects. First, its focus on the nature of

the transaction eliminates wholesale an entire category of commercial relationships without properly accounting for the fact-sensitive inquiry required by our case law. Clearly, a motivating factor in this dispute was Mr. Holland's recommendation that the Yenchis consolidate their several, life insurance policies into a single policy, brokered by him and ultimately discovered to be underfunded. However, the Yenchis claim a confidential relationship arose with Mr. Holland, prior to their purchase of life insurance, when they agreed to purchase what they believed was independent, financial planning advice. It is significant that Mr. Holland cultivated a relationship with the Yenchis first as a financial advisor, not an insurance salesperson. That this advice resulted in their purchase of life insurance products from Appellees is not determinative of the nature of their relationship.

Second, the court's requirement that there be evidence an insured ceded decision-making authority to the insurer is too rigid. Evidence supporting a confidential relationship must reveal an "over-mastering *influence*," not absolute or overt control. **Basile**, 777 A.2d at 101 (emphasis added). A plaintiff may also establish a confidential relationship by demonstrating "weakness, dependence or trust, justifiably reposed." **Id.** Clearly, this standard, too, can be met with evidence less absolute than a complete cession of decision-making authority. For example, here, the Yenchis contend their dependence upon Mr. Holland arose because he promoted his services as a financial advisor and they paid him to develop a

comprehensive, objective, financial plan. Thus, according to the Yenchis, their trust was justifiably reposed. A proper analysis of these facts must include some measure of flexibility not present in the trial court's rule.

Appellees presented a narrow claim for summary judgment on the Yenchis' fiduciary claim. The court's application of a flawed rule of law and failure to conduct a proper analysis renders its decision an abuse of discretion. Accordingly, we reverse the trial court on this ground. To be clear, we do not hold that evidence of Appellees' purported positions as financial advisors is sufficient by itself to establish a confidential relationship. The law in this regard is not yet well developed, and the record in this case remains incomplete.[6] Rather, we merely reject the trial court's formulation

_____

[6] We have examined precedent from other states, cited favorably by the Yenchis, that considered similar situations in which an insurance agent or broker endeavored to provide financial services beyond insurance. These cases offer little substantive analysis supportive of their argument. *See, e.g.*, *Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F.Supp.2d 998, 1004 (C.D.Cal. 2006) (based on preliminary, procedural standards, denying a motion to dismiss plaintiff's fiduciary claim where defendant insurer purportedly served as a financial advisor to insured); *Murphy v. Kuhn*, 90 N.Y.2d 266, 272 (1997) (recognizing in dicta that an insurance agent may incur additional responsibilities where he "receives compensation for consultation apart from payment of the premiums"). We do not find them persuasive. Other case cited simply do not support the premise for which Appellants cite them or are clearly inapposite. *See, e.g*, *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 460-61 (9th Cir. 1986) (holding, *pursuant to Section 10(b) of the Securities Exchange Act*, that an investment advisor incurred "a duty to explain the nature of short selling" securities); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 111-12 (N.D.Ala. 1971) (rejecting any fiduciary duty in the

*(Footnote Continued Next Page)*

of an exclusionary rule as sufficient to account for the fact-sensitive inquiry required.

In their second issue, the Yenchis contend that the trial court erred when it denied their motion to compel Appellees' production of certain documents demonstrating their allegedly improper sales practices. The procedural background to this issue is complex. Essentially, when this litigation commenced, it was one of twenty-nine cases brought against IDS and/or American Express Financial Advisors in Allegheny County, Pennsylvania. In April 2010, one of those cases, **Boehm v. Ameriprise Fin., Inc.**, GD-01-008289 (C.C.P. of Allegheny Cnty.), was designated the lead case for the production of "global" discovery and for resolution of discovery issues. **See** Appellants' Motion for Clarification of Rule 1925 Memorandum Dated July 25, 2014 (Motion for Clarification), 07/30/2014, at 2-3.

In December 2012, the **Boehm** plaintiffs filed a motion to compel production of documents "regarding the decision making process and management[']s awareness of the use of deceptive sales practices." Motion for Clarification, Exhibit 2 ("Plaintiff's Second Motion to Compel …"), at ¶ 10. The **Boehm** trial court denied the motion. **See** Motion for Clarification,

_(Footnote Continued)_ ───────────

context of a broker-client relationship absent a "special relationship of trust and confidence" or a contractual obligation).

Exhibit 4 ("Order of Court," 12/27/2012).  The record does not reveal any further action.  Thus, we cannot say with certainty whether the **Boehm** plaintiffs pursued reconsideration or appellate review of the court's order.

Nevertheless, it is clear that the Yenchis did not seek relief from the **Boehm** court order before the trial court *in this case*, nor did they otherwise attempt to secure the documents requested in the **Boehm** motion to compel.  The earliest this issue appears in the record for this case is when the Yenchis filed their Pa.R.A.P. 1925(b) statement.  Our law is clear:

> On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected.  In this jurisdiction ... one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

**Thompson v. Thompson**, 963 A.2d 474, 475-76 (Pa. Super. 2008); **see also** Pa.R.A.P. 302(a) ("Issue not raised in the lower court are waived and cannot be raised for the first time on appeal.").  Accordingly, this claim is waived.[7]

_____

[7] Absent waiver, the Yenchis' claim is without merit.  According to the Yenchis, the requested corporate sales practices documents were relevant to prove fraudulent conduct, citing in support **Lesoon v. Metropolitan Life Ins. Co.**, 898 A.2d 620 (Pa. Super. 2006).  However, the **Lesoon** court concluded that this evidence was not "relevant to any material issue at trial *except punitive damages*."  **Id.** at 634 (emphasis added).  Here the jury rejected the Yenchi's claim for fraud.  Accordingly, the disputed evidence was not relevant.
*(Footnote Continued Next Page)*

In their third issue, the Yenchis contend the trial court erred when it granted Appellees' motions in limine, which sought to preclude certain evidence related to the suitability of the insurance policy sold to the Yenchis. The trial court based its decision upon the prior dismissal of the Yenchis' fiduciary claim.[8]

> [O]ur standard of review of a trial court's decision to admit or exclude evidence is well-settled[.]  When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law.  In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.  An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

***Stumpf v. Nye***, 950 A.2d 1032, 1035-36 (Pa. Super. 2008) (internal quotation marks omitted; formatting modified).  "A party suffers prejudice when the trial court's error could have affected the verdict."  ***Reott v. Asia Trend, Inc.***, 7 A.3d 830, 839 (Pa. Super. 2010).

The trial court does not dispute the basis of its decision:

> The [] claim of error … does not appear to assert direct error by the undersigned.  The undersigned's ruling with respect to

*(Footnote Continued)* ─────────────

---

[8] Appellees filed a Motion in Limine Regarding Financial Plans (01/23/2014) and a Motion in Limine to Exclude [Expert] Testimony of Deborah Senn (01/23/2014).

motions in limine were a function of prior orders and decisions of other jurists resulting in the dismissal of [Appellants'] fiduciary duty claim. … As the undersigned is bound by the prior determinations of a coequal judge with respect to the dismissal of [Appellants'] fiduciary duty claim, it was not error to grant [Appellees'] motions in limine based upon the prior dismissal of such claims.

Trial Court 1925(a) Memorandum (Colville, J.), 06/12/2014, at 2.

We have reversed the trial court's decision regarding the Yenchis' fiduciary duty claim. Accordingly, we vacate the court's disposition of Appellees' motions in limine as a clear error of law. Moreover, the exclusion of this evidence could have affected the verdict in the Yenchis' trial of their fraudulent misrepresentation and UTPCPL claims.[9] Accordingly, absent legal

_____

[9] To state a claim for common law fraud, the plaintiff must show: (1) a representation; (2) material to the transaction at issue; (3) made falsely, with either knowledge or reckless disregard of its falsity; (4) with the intent to misleading another person or inducing justifiable reliance; and (5) an injury caused by the reliance. *See Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 152 n.5 (Pa. Super. 2012) (citing *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999)). "[F]raud must be established by clear and convincing evidence and rests with the party alleging it." *Rohm & Haas Co. v. Continental Cas. Co.*, 781 A.2d 1172, 1179 (Pa. 2001). However, "fraud can rarely if ever be shown by direct proof. It must necessarily be largely inferred from the surrounding circumstances." *Id.* Thus, latitude is afforded the fraud plaintiff in presenting evidence. *See id.*; *see also Snayberger v. Fahl*, 45 A. 1065, 1067 (Pa. 1900).

In light of the procedural complexities of this case, we further note that the Yenchis did not challenge the trial court's dismissal of their claim for fraud regarding the 1997 annuity. Indeed, during the summary judgment stage of this litigation, the Yenchis expressly limited their fraud claim in the following manner:

*(Footnote Continued Next Page)*

- 17 -

support for its exclusion, we grant the Yenchis' request for a new trial on these claims. Upon remand, the trial court may revisit the issues raised in the motions in limine.

In their fourth issue, the Yenchis contend that the court committed reversible error when it applied the pre-amendment version of the UTPCPL. Statutory interpretation presents a question of law. *Snead v. Soc'y for Prevention of Cruelty to Animals of Pa.*, 985 A.2d 909, 912 (Pa. 2009). Thus, our standard of review is *de novo*, and our scope of review is plenary. *Id.*

The relevant UTPCPL statutory language, 73 P.S. § 201-2(4), was amended on December 4, 1996, with an effective date of February 2, 1997. In particular, Section 201-2(4)(xxi), which is the UTPCPL's so-called catchall provision, was amended to prohibit one from "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." *Id.* Previously, "deceptive conduct" was not included in the UTPCPL catchall provision.

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

> In other words, in the instant case, [the Yenchis] alleged that by providing a contract which provided for an increasing cost of insurance, and not the fixed premium which [Appellees] represented to be an element of the contract that [the Yenchis were] entering into, [Appellees] fraudulently and in violation of the UTPCPL omitted an essential and material element of the agreed upon contract.

Appellants' Response at 17.

- 18 -

"This Court applies current statutory law until the Legislature repeals or amends it." *Commonwealth v. Thomas*, 51 A.3d 255, 260 (Pa. 2012). Section 1926 of the Statutory Construction Act provides that "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S. § 1926. Thus, there is a presumption against the retroactive effect of statutes. *Thomas*, 51 A.3d at 260.

However,

[c]ase law provides … that legislation concerning purely procedural matters, not substantive matters, may be applied to litigation existing at the time of passage as well as litigation commenced after its passage. As a general rule, substantive law is that part of the law which creates, defines and regulates rights, while procedural laws are those that address methods by which rights are enforced.

*Commonwealth v. Estman*, 868 A.2d 1210, 1212 (Pa. Super. 2005) (internal citations and quotation marks omitted).

The amended language of Section 201-2(4)(xxi) created a new, substantive cause of action based upon "deceptive conduct." Absent from the amendment is any clear indication of the Legislature's intent for its retroactive application. Accordingly, we may not construe it so. *Thomas*; *Estman*.

Here, the allegedly deceptive practices that support the Yenchis'
UTPCPL claim all occurred prior to August 1996.[10]   Accordingly, their
contention is without merit, and the pre-amended version of the UTPCPL
controls.

In their fifth issue, the Yenchis contend the trial court erred when it
struck five proposed voir dire questions. The proposed questions were:

> 1.  What do you need to know in order to decide if an insurance
> company cheated someone in the sale of a life insurance policy?
>
> 2.  Why do you believe life insurance companies advertise that
> people should trust their advice?
>
> 3.  Should a company be able to make money cheating people?
>
> 4.  If a person catches a company cheating them, and somehow
> after a number of years gets their money back, who should get
> the profit of interest made on the money while the company held
> it?
>
> 5.  If a company or its agents cheats someone out of their
> money, what do you feel should be done to stop them from ever
> doing this again?

**See** Trial Court 1925(a) Memorandum (Folino, J.), 09/03/2014, at 3-5.

According to the Yenchis, the trial court was required to amend the
language of the proposed voir dire into a form acceptable to the Court, citing
in support **Commonwealth v. Davis**, 422 A.2d 671, 673 (Pa. Super. 1980)
(*en banc*) (holding that a trial court "should not totally reject an entire line
of otherwise relevant inquiry," but should "mold [an impermissibly broad

---

[10] The IDS Life Insurance policy was issued on August 15, 1996.

question] into an acceptably limited form").  The Yenchis' contention is without merit.

The following standard applies:

The sole purpose of voir dire examination is to secure a fair, competent and impartial jury.  To achieve this purpose, general questions should be permitted so that it can be determined whether any of the veniremen have a direct or even a contingent interest in the outcome of the litigation or the parties involved. The scope and extent of voir dire examination is within the sound discretion of the trial court and the trial court's rulings thereon will not be disturbed absent a clear abuse of that discretion.

*Capoferri v. Children's Hosp. of Phila.*, 893 A.2d 133, 138 (Pa. Super. 2006) (some punctuation modified).

Here, the trial court examined each of the proposed questions.  *See* Trial Court 1925(a) Memorandum (Folino, J.), 09/03/2014, at 3-6.  Following its review, the court determined that the proposed questions were not designed to address potential bias of jurors, but rather to ask potential jurors what they thought the law should be, or to glean what evidence potential jurors would find persuasive.  We agree that this type of questioning is inappropriate.  *See, e.g.*, *Commonwealth v. Manley*, 985 A.2d 256, 264 (Pa. Super. 2009) (rejecting "hypothetical questions designed to disclose a juror's present impression or opinion as to what his decision will

likely be under certain facts which may be developed in the trial of the case"). Accordingly, we discern no abuse of the trial court's discretion.[11]

For the above reasons, we reverse the summary judgment entered by the trial court in favor of Appellees regarding the Yenchis' claim for breach of fiduciary duty. Moreover, we vacate the judgment entered and remand for a new trial on their fraudulent misrepresentation and UTPCPL claims. Finally, we discern no error of law in the court's determination that the pre-amended version of the UTPCPL applies to the Yenchis' claims and no abuse of the court's discretion in rejecting their proposed voir dire questions. Thus, we affirm the court on those grounds.

Judgment vacated. Case remanded. Jurisdiction relinquished.

Judge Mundy joins this opinion.

Judge Lazarus files a concurring and dissenting opinion.

---

[11] The Yenchis further contend that they were denied an opportunity to amend their questions. There is no evidence that the Yenchis sought leave to amend. We deem the matter waived. **See** Pa.R.A.P. 302(a).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2015